IN ERROR.

......

ALBANY,
March, 1812.

JAMES GRANT, FRANCIS ARTHUR, AND MA-
RY HIS WIFE, (FORMERLY MARY GRANT,)
ELIZABETH GRANT, JANE GRANT, RO-
BERT GRANT, WILLIAM GRANT, (THE
SAID JANE, ROBERT AND WILLIAM, BY
THE SAID JAMES GRANT, THEIR BROTHER
AND GUARDIAN,) JONATHAN AIKINS, AND
CHRISTIE GRANT, } *Appellants,*

GRANT
v.
DUANE.

*against*

MARIA DUANE, JAMES C. DUANE, WILLIAM
NORTH, AND MARY HIS WIFE, SARAH
DUANE, CATHARINE L. DUANE, ADELIA
DUANE, SOLOMON BAKER, BENJAMIN BA-
KER AND NATHANIEL PARKER, } *Respondents.*

THE bill in this cause was originally filed in the court of chan-
cery, by *Maria Duane, William North* and *James C. Duane,*
as *executors* of the will of *James Duane,* Esq. deceased, and *trus-
tees* named in his will, and by *Solomon Baker, Benjamin Baker*
and *Nathaniel Parker,* on the 17th *June,* 1799.

It stated that *David Shaw* was seised of two tracts of land, the
one originally granted to *Thomas Menzies,* the other to *John Wat-
kins,* each containing 2,000 acres of land, situate in *Granville,* in the
county of *Washington. Shaw* being indebted to *James Grant,* de-
ceased, in 180*l.* mortgaged those lands to him, on the 26th *Novem-
ber,* 1765, for securing the payment of that sum, with interest, on a
certain day specified in the mortgage, which contained a power of
sale.

That on the 21st of *July,* 1766, *David Shaw, John Alex-
ander* and *John Gregg* made a composition with their creditors,
indenture, *tripartite,* conveyed *all their estates,* real and personal, but without specifying the mort-
gaged premises, to D., E. & F. and to the survivors and survivor, and the heirs of such survivor,
parties of the third part, in *trust* for the creditors of S., B. & C. described as named, and whose
debts were specified in a schedule, annexed, of the second part. S. died afterwards ; and E. & F.
two of the trustees named, died during the revolutionary war, and D. the surviving trustee, died
in 1797. In 1799, the executors of D. and named as trustees in his will, filed a bill in chancery
against the heirs of G. for the redemption of the mortgaged premises ; and after replication was
filed, and publication passed, the *heirs* of D. in 1806, were made parties complainants. It was *held*
that, after such a lapse of time, it must be presumed that the debts of S., B. & C. had been paid,
and the objects of the trust satisfied out of the other property, or otherwise ; the existence of any
of the debts not being shown; and that the *heirs* of D. had not, therefore, any interest which could
entitle them to a redemption, but that the equity of redemption, if not wholly barred by the lapse
of time, remained in the heirs of S. the mortgagor; especially, as the indenture produced by the
complainants, and relied on by them as creating the trust estate, was not executed by the trustees,
nor by the creditors, nor was any schedule annexed to it, and there was evidence affording a pre-
sumption, that the arrangement between S., B. & C. and their creditors, was either not consum-
mated, or was abandoned, or superseded by some other agreement.

Where an objection is made in the court below of a want of parties, it may be insisted on, on
appeal, in this court.

*Marginal note:* No person can come into a court of equity, for a redemption of a mortgage, unless he is entitled to the estate of the mortgagor, or claims a subsisting interest under it. S. in 1765, mortgaged a tract of land to G. to secure a debt. In 1766, S. & B. & C. his copartners in trade, being insolvent, made a composition with their creditors, and by their

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

and, in consequence thereof, by and with the consent and approbation of their creditors, assigned and conveyed all their estates to *James Duane*, deceased, *Lawrence Reade* and *Henry White*, also deceased, *in trust for the creditors of David Shaw, John Alexander* and *John Gregg*.

That until, and during the revolutionary war, the mortgaged premises remained in a great measure unoccupied, and settlers were deterred from entering upon and cultivating the same, by reason of their exposure to the incursions of the enemy.

That *Reade* and *White* died during the war, and *James Duane*, deceased, *survived* them. He died about the first of *July*, 1797, having made his will, and the respondents above named, his *executors* and *trustees* of his estate.

That on the 28th of *December*, 1796, *James Duane*, since deceased, wrote to *Jonathan Aikin*, one of the appellants, and *executor* of *James Grant*, then lately deceased, saying, "*that he had not been able to discover where James Grant resided,*" so as to pay him the money due upon the mortgage, and offering to pay it to the appellants, who refused to receive the same.

That about the 20th of *February*, 1796, *James Duane*, deceased, demised the lands in *Menzies'* patent to the two *Bakers*, *Parker*, and six other persons, who hold and have improved the same under such demises.

That *Grant*, the mortgagee, died, leaving the appellants, his *executors, heirs and devisees.*

That since the death of the mortgagee, the appellants have sold the land contained in *Watkins's* patent, by virtue of the power contained in the mortgage, for about *four thousand pounds*, and brought ejectments against the *Bakers* and *Parker*.

They, therefore, prayed an injunction, an account, and redemption.

The defendants, now appellants, by their answers, admitted the seisin of *Shaw*, and that he had executed to *James Grant*, deceased, the mortgage stated in the bill, but stated that they knew nothing of the conveyance by *Shaw* and others to *James Duane* and others, stated by the respondents. They admitted the deaths of *Lawrence Reade, Henry White* and *James Duane*, as mentioned in the bill, but said they knew nothing of *Duane's* will. They stated that when the mortgage was executed, the lands comprised in it were of little value, and the mortgagee would have preferred to receive his money, but that *Shaw* having failed, he had no

1

hopes of receiving it; for which reason, he, about that time, entered upon the land, placed settlers on it, made agreements with them, and expended money in surveying, improvements, &c. acting as the proprietor, *until his death, in April,* 1796, *for a period of above twenty-eight years ;* that during all that time, no money was paid or tendered to him, nor any measure taken to redeem the estate ; that several of the settlements and acts of ownership aforesaid, took place within three years after the date of the mortgage.

IN ERROR.
......
ALBANY,
March, 1812.
GRANT
v.
DUANE.

They stated that they believed that *James Duane* knew *James Grant,* deceased, and often saw him. They denied that the appellant, *Jonathan Aikin,* ever received such a letter as is stated in the bill, or that he ever had any money tendered to him by *James Duane.* They averred that the *Bakers, Parker,* and the other persons, who, as stated in the bill, took leases from *James Duane,* deceased, settled upon *the lands under James Grant, and as his tenants.* That they knew nothing, however, of the leases said to have been executed by *Duane,* nor of any improvements stated to have been made under him. They claimed title to the lands under *James Grant,* deceased, whose right they considered, at his decease, as absolute and irredeemable ; and they sold the land in *Watkins's* patent, under such title, as owners, and not by virtue of the power contained in the mortgage. They insisted upon the benefit of all the circumstances above stated, as fully as if they had pleaded them, and concluded by denying combination, &c.

General replications were filed to the answers, and, in 1804, a number of witnesses were examined on both sides. These depositions chiefly related to the acts of *Grant,* the mortgagee, and the possession of the mortgaged premises.

*Joseph Whitney,* a witness for the respondents, stated that, in October, 1796, he went with *Baker* to the appellant, *Grant,* to discharge the mortgage, and *Baker* made a tender of 600*l.* which he had with him, in gold and silver, but that *Grant* refused to accept the tender, and would have nothing to do with *Baker ;* that the respondents are in possession of the tract granted to *Menzies,* called the *South* patent; that the *North* patent was sold by *Grant's* executors, for about 8,000 dollars, except about 50 acres ; that about 25 years ago, *Baker* and others were in possession of their respective farms, which they afterwards bought of the respondents; that when they took possession, they sup-

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

posed they were public lands, and that they should, therefore, be suffered to retain their possessions. Several witnesses on the part of the appellants proved the sale of lands in *Watkins's* patent, called the *North* patent, and that the deeds executed to the purchasers were in the same form, and had no reference to the power in the mortgage; the appellants claiming the estate absolutely, from length of possession under the mortgage.

The form of the deed referred to by the witnesses was made an exhibit in the cause; the grantors were *Jonathan Aikin, James Grant* and *Christie Grant,* executors of the last will and testament of *James Grant,* deceased, and authorized by the will to sell his lands. It was in the usual form of a deed from executors or trustees.

Several witnesses for the respondents, who had deeds from the executors of *James Grant,* deceased, testified that they claimed the right to sell, in consequence of length of possession under the mortgage and a lease. But the witnesses all took deeds similar to the one exhibited.

It was proved, on the part of the appellants, that *William Fairfield* was on the land in 1772, having purchased the possession of one *Comstock* in 1774, when he agreed with *Grant* for the purchase of 400 acres, including the place on which he then lived. One *Corey* was also in possession at the same time, under *Grant. Amos Utter* testified that, in 1777, he saw *Fairfield* and *Corey* on the lands, and that about 18 years before his examination he moved to *Granville,* when he saw *Parker* and *Baker. Parker* lived on the land formerly held by *Fairfield,* and *Baker* on that held by *Corey.* In 1791, *James Grant* had the land surveyed, according to the possessions, and told *Parker* and *Baker* to remain on the land, and he would sell to them.

*Jeremiah Spicer* and *Thankful Corey* also proved that the lands were known as *Grant's* lands; and that *Parker* and *Baker* were settlers in the *South* patent, and the settlers always acknowledged *James Grant* as the landlord. *Baker* purchased his possession of *Corey. Spicer* was employed by the settlers in the *North* patent, to purchase for them from the executors of *Grant,* who claimed the land, as absolutely vested in *Grant,* by right of possession; that *Baker* and other settlers wished purchases to be made, for them, in the *South* patent, from *Grant;* but afterwards broke off, on account of *Duane's* claim.

*James Earle* surveyed the *South* patent about the year 1792, when the whole was under settlements made under *Grant.*

most of the settlements were made in 1784, about 20 years before the time of his examination. The settlers have since taken leases from *James Duane.*

Among the proofs was, also, a letter, dated the 22d *December,* 1791, from *James Duane* to *James Grant,* directed to *Grant,* at *Fredericksburgh,* in *Duchess* county, in which *Duane* requests *Grant* to send his papers to *New-York,* saying, that he had lately sold some of the land of *Shaw,* and expected soon to do *Grant* justice. It did not appear that any answer was given to the letter.

After publication had passed, and the cause had been several times set down and noticed for hearing, a motion was made to amend the bill of the respondents, by adding the heirs of *James Duane,* deceased, as parties; and an order for that purpose was granted, on the 13th *August,* 1806, and they were brought in as joint complainants in the cause.

At the hearing, the respondents produced an indenture, dated the 21st *July,* 1766, between *John Alexander, John Gregg* and *David Shaw,* copartners in trade, of the *first part;* and the creditors of *Alexander, Gregg* and *Shaw,* who were named, and whose debts were specified in the schedule annexed, of the *second part;* and *Lawrence Reade, Henry White* and *James Duane,* of the *third part.* This indenture recited that, in consideration that the parties of the second part had agreed to release and discharge the parties of the first part from all debts due by them to the parties of the second part, &c. *Alexander, Gregg* and *Shaw* granted, &c. to the parties of the third part, all the certain dwelling-house, &c. (describing the property,) and *also all other the lands, tenements, hereditaments and real estate, whereof Alexander, Gregg and Shaw were jointly or severally seised, or entitled to, in law or equity, &c.* Upon the *special trust* and confidence expressed and declared in the indenture, &c. and the parties of the first part also assigned over all their personal estate to the parties of the third part, on the same trust, that is, that the parties of the third part should sell and dispose of all the property so conveyed and assigned to them, &c. and after discharging all *mortgages and encumbrances wherewith the same might be in any way encumbered, &c.* to distribute all the clear moneys, &c. among the creditors of the parties of the second part, *whose debts are not secured by mortgage,* in equal proportion, &c.; and upon the further trust, that *if all the debts due from the parties of the first part, can be*

*IN ERROR.*
......
ALBANY,
March, 1812.
GRANT
v.
DUANE.

*satisfied by a sale of part only of the premises thereby granted, then the parties of the third part, or the survivors or survivor of them, or the heirs of such survivor, shall in due form of law reconvey all the residuary and remaining part of the premises, unto the parties of the first part, their heirs and assigns, &c.* And in case the whole property was converted into money, then the surplus, after paying the debts, &c. was to be paid over to the parties of the first part: and the parties of the second part covenanted with the parties of the first part, to accept and receive the premises so granted and released to the parties of the third part, *in full satisfaction of their respective debts,* and that as soon as the parties of the first part had delivered up all their property, &c. that they, the parties of the second part, would seal and execute a *sufficient* release of each of their debts and demands against the parties of the first part. *And further,* that in case any of the creditors of the parties of the first part should refuse to become a party to that indenture, that then the parties of the second part should, on the request of the parties of the first part, pursue and take the measures prescribed by law, for the procuring the parties of the first part a final discharge from all their debts, by the acts for the relief of insolvent debtors, &c. This indenture was executed by *David Shaw,* for himself and *John Alexander & Co.*

The respondents also produced a *deed-poll,* dated in *December,* 1767, executed by *John Alexander* and *John Gregg;* reciting that whereas by certain indentures of *composition, &c.* lately made and executed by and between *Alexander* and *Gregg,* and their late copartner *David Shaw,* deceased, of the first part, and the creditors of *Alexander, Gregg* and *Shaw,* whose names are specified in a schedule to the same indenture annexed, of the second part, and *Lawrence Reade, Henry White* and *James Duane,* of the third part, the parties of the second part had compounded and agreed with the parties of the first part, &c. and among other things, it was particularly covenanted and agreed to and with the parties of the first part, " that if any of the creditors of *Alexander, Gregg* and *Shaw* shall refuse to release and discharge *Alexander, Gregg* and *Shaw,* their heirs, &c. from the debts, sums of money, dues and demands, &c. that then and in such case, the same indentures, grant and assignment should be void and of none effect, and that the parties of the third part should, upon such refusal, reconvey the premises, &c. and should repay to *John Gregg* 2,500*l.,* thereby covenanted and agreed to be paid or secured by

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

*John Gregg*, &c. reciting also several other covenants as contained in the *indenture* of composition, but none of which were contained in the indenture before mentioned, produced at the hearing; and reciting further, that whereas the principal part of the creditors of *Alexander, Gregg* and *Shaw*, had executed the indenture, and that by reason of absence, &c. there was no prospect of the others executing the same; and by reason of the covenants above recited, the indentures were likely to become defeated, the estate of *Alexander, Gregg* and *Shaw* wasted, and *Alexander, Gregg* and *Shaw* embarrassed, &c. And whereas *Shaw*, since the execution of the indentures, had died; it had been agreed by the remaining parties that the recited covenants should be released and discharged; without which it would be impracticable to carry the composition into effect: *Alexander* and *Gregg* did, by the deed, thereupon release, &c. all the *recited covenants*, to *Reade, White* and *Duane*, &c. provided that all the other parts of the indenture, except the covenants so recited and released, should remain valid, and effectual, &c.

A *lease* was also produced, dated the 20th *February*, 1796, from *James Duane* to *B.* and *S. Baker, Parker,* and six others, reciting that the lessees occupied the lands in the tract mortgaged by *Shaw* to *Grant,* called *Menzies'* patent, under the title of *Duane,* &c. and leasing the same for 7 years ; and *Duane* covenanted, that if the lessees would, at any time within the 7 years, pay 600*l.* with all arrears of rent, then he, or his heirs, would execute a deed of conveyance to them, for the land, free from all encumbrances, except the mortgage to *Grant,* if it should then be in existence, and which, as far as it should be just, should be satisfied out of the consideration money, &c.

The cause having been brought to a hearing, his honour, the chancellor, on the 1st *June,* 1810, pronounced his *decree,* the parts of which, it is thought material to state here, were,

That the heirs and legal representatives of *James Duane,* deceased, had a right to redeem so much of the mortgaged premises as were not sold by the executors and legal representatives of *James Grant,* deceased, previous to filing the complainants' bill, to wit, the 17th *June,* 1799, upon the terms and according to the principles and directions specified in the decree ; and that the heirs and legal representatives of *Duane* were entitled to an account of the proceeds of the sales of so much and such parts of the mortgaged premises, as were sold by the executors and legal

representatives of *Grant,* previous to filing the bill of the com-
plainants, &c. &c.

From this decree the defendants below appealed to this court.
The reasons for the decree were thus assigned by

THE CHANCELLOR. The mortgage in question was made on
the 26th of *November,* 1765.

The assignment under which the complainants derive their title
to the equity of redemption was made in 1766.

The bill was filed in 1799, which is 33 years after the date of
the mortgage.

If the mortgagee did not enter till three years after the assign-
ment, it would reduce it to 30 years; and it appears from the de-
positions of *William Fairfield* and *Thankful Corey,* that ——
*Corey* settled on *Watkins's* patent, under *Grant,* in 1774; and that
*Fairfield,* in the same year, agreed to purchase of *Grant* 400
acres, on part of which he was then settled. It appears, from the
testimony, that both abandoned their possessions during the revo-
lutionary war, that country then being its seat; and the complain-
ants insist that the period of the war, as well from that circum-
stance, as the general analogy subsisting between an equitable and
statute limitation, ought to be excluded.

The statute of limitations, passed the 26th of *February,* 1788,
provided, that no part of the time, from the 14th of *October,*
1775, to the 21st of *March,* 1783, shall be considered as any part
of the period during which the limitations are to run. If the
time of settling by *Fairfield* and *Corey* is to be considered as
the period of taking possession of the whole of the mortgaged
premises, which I shall hereafter consider, the time intermediate
that event and filing the bill, covered by the limitation, is not more
than 17 or 18 years; and, by analogy to the statute of limitations,
which has been uniformly preserved as to subjects of this nature,
is not sufficient to bar the complainants from their equity of re-
demption.

The sale by the executors of the mortgagee, of *Watkins's*
patent was made in 1796, and in the condition of the bond exe-
cuted by them to the purchasers, on that occasion, they under-
took *to search, look out* and *procure* the title of *James Grant,*
their testator; a language indicating doubt and uncertainty as to
the title, which could only have arisen from the circumstances at-

tending the possession of the mortgaged premises, for they could
have no ground for doubt as to their right, as representing the
mortgagee. The only doubt it would admit of was, whether the
interest of their testator had, by length of time, ripened into an
indefeasible estate in fee-simple, instead of a defeasible one by re-
demption.

IN ERROR.
......
ALBANY,
March, 1812.
GRANT
v.
DUANE.

To the complainants' right of recovery it was objected,

1. That the amended bill, by which the heirs of *James Duane*
were introduced as parties, was not filed, and could have no effect
till 1806.

2. That the deed of assignment did not pass the interest of the
mortgagor in the mortgaged premises.

3. That actual seisin attached to the right, and so the seisin was
from the date of the mortgage.

4. That *James Duane* obtained possession by collusion, and
so it was not available to him.

5. That the tender was invalid, because *Baker* had no right to
tender.

6. That there was a resulting trust in favour of *Shaw's* heirs,
who ought to have been parties.

I had no doubt as to the first point. The amended bill had a
retrospective effect, and related to the time of filing the original bill,
and I know of no authority or principle, which will warrant a differ-
ent construction.

The second point arose on the indenture of assignment which
is dated the 21st of *July*, 1766. [Here his honour stated the in-
denture.]

This indenture was executed by *David Shaw*, for himself and
for *J. Alexander & Co.*

In *December*, 1767, *John Alexander* and *John Gregg* execu-
ted a deed-poll, incorrectly reciting the indenture; also reciting
that *David Shaw* was then dead, and pretending to discharge cer-
tain covenants and conditions contained in it, but which could not
affect the interests of *David Shaw*, in this estate.

The debts for which the composition was made, were those of
the firm. The mortgaged premises were the estate of *David
Shaw* solely. The indenture purported to grant all the estate of
the firm and of the copartners separately, and the mortgaged pre-
mises could only pass, as included under the latter description;
and so far as respected this property, it derived its efficacy from
*Shaw's* grant only. The acts of the surviving partners could

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

not affect the disposition *Shaw* had made of it, unless they had satisfied all the debts, and then come in to receive contribution under the trust. The recital that the indenture was to be void, if all the creditors did not accede to it, was a subject of some discussion; but the recital is not correspondent to the contents of the deed. The alternative provided in it, being merely that if all the creditors should not accede, those that did, should aid the firm of *Alexander, Gregg* and *Shaw* in procuring the benefit of the act of insolvency.

It is true, the deed is defective in omitting the names of the persons who acceded to the composition, but that was not essential to its operation, for one consideration expressed in it, the satisfaction of the encumbrances on the estate conveyed to the trustees, is a valid one, and if a deed is given for two considerations, and one fails, there is no doubt but the valid one will sustain it. If none of the creditors had acceded to it on that ground, and as it relates to the present controversy, it would still be operative; that they have acceded, can only be collected from the recitals in the second deed, the parties to which were not privies as to this property. That deed was not adverted to in the pleadings, but it seems it was produced by the complainants at the requisition of the defendants.

The primary object of the trust was the disencumbering the property; the principal consideration was providing a fund for the satisfaction of the debts of the firm. For the execution of those trusts, the trustees were to respond to their *cestuy que trust;* but both at law and in this court, they were competent to assert their rights, in their own names, without introducing those of the creditors, as beneficially interested in the trust fund. It is one of the most useful properties of such trustees, that they are capable, both at law and in equity, to assert the rights, and thereby bind the interests, of their *cestuy que trusts,* and it is the uniform practice in chancery, to permit them to sustain suits in that mode.

Having adverted to the period to which the limitation contended for can only apply, I shall now consider the acts of the mortgagee and his representatives, as connected with that subject. These consist of surveys, settlements, sales, and other assertions of ownership. [Here his honour stated the proofs in the cause.]

These settlements, till within a very few years, appear to have been made exclusively on *Watkins's* patent. There is no allegation, and no proof, that any definite terms were agreed on by

*Grant*, the mortgagee, those of *Fairfield* and *Corey* excepted, and the first is stated as a purchaser in 1774, of 400 acres, which is totally inconsistent with the estate held as mortgaged, but *Earle* also adds, that *Grant* informed him that the patent under which he sold, was derived by him from the crown, for his services in the war which ended in 1763. There is no evidence to connect *Baker's* title with that of *Fairfield*, but the evidence of Mrs. *Corey*, that he sold to *Baker*, and his declaration, testified to by *Earle*, that he held under a written contract, of which no evidence is given.

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

From the whole scope of the evidence, as relates to this point, it does not appear that a single lease has been given, or a written contract made by the mortgagee, the one to *Corey* excepted, any rent received, or any other than general acknowledgments of holding under the mortgagee ever made. The adapting the surveys to the different possessions mentioned by *Earle*, shows that there were no definite arrangements, and the singular complexion of the condition of the bond, executed by the executors of the mortgagee to the purchasers of *Watkins's* patent, to *search, look out* and *procure* the title of their testator, shows that the settlements and the acknowledgments of the occupants of the land, in the opinion of the parties, even after the death of the mortgagee, were not so determinate as satisfactorily to fix the relation of landlord and tenant, even in their own estimation.

The mode of entry offers another consideration which may have some influence on this point.

Upon making a feoffment of two distinct parcels of land, in the same county, livery of seisin on one of them, by the feoffor to the feoffee, in the name of both, has been held to be sufficient as to both. So an entry on any part of a tract granted by the grantee, and a consequent possession, might enure to extend the constructive possession, in the whole extent of the grant, according to the right: but here is not the least evidence which, on any possible legal construction, can expound the acts of settlement, so as to make them commensurate with the patents described in the mortgage.

The first settlement, that of *Fairfield*, was limited to *four hundred acres*, in *Watkins's* patent. That tract contained 2,000 acres. It was on a contract for a sale in fee, on the assumption that the mortgagee, at that early day, was the absolute owner; it was not

above 7 or 8 years after the date of the mortgage; and there could not be the least possible pretence, that lapse of time could have operated to discharge the equity of redemption; the contract was professedly made under another, as the witness who mentions it understood. In all these points, it is inconsistent with the title derived under the mortgage, but the entry and possession in consequence of it, were incapable, on any construction, of being extended, so as to comport with the dimensions of the patent. There is no account of the extent or terms on which *Corey* settled; nor is the title under him deduced to the present possessor, *Baker;* but whatever were the extent or terms, it is a mere farm out of the tract; and if so, the same observations apply to his possession which I supposed applicable to that of *Fairfield.*

*Earle* says that most, if not all, the other possessions were taken about twenty years before his examination, which was in 1804, and so not above 15 years from the commencement of the suit.

The case of *Rakestraw* v. *Bewer,* (*Select Cases in Chancery,* 55.) is in point, that a mortgagor in possession of any part shall redeem the whole, and that after a lapse of 39 years; there was an appeal from the rolls, and the decree was affirmed by Lord *King,* who said part might be redeemed, as being in possession, and part he could not separate from the whole; and, therefore, he should redeem the whole. (*Mosely,* 189.)

It has been held that an entry, after a grant, by a grantee, perfected on the land described in the grant, and a subsequent possession of a part, shall be deemed to be a possession of the whole. But here the bounds to which the possession extended, were limited to a smaller space than that covered by the patent. No legal intendment can be admitted to swell them to the dimensions of the patent. The mortgagor and his heirs or assigns, therefore, retained the possession, and as long as there was no actual possession, it must be supposed to attach to the right. The mode of obtaining possession is affected by the same doctrine. It is to little purpose to direct the possession to be restored, if the complainants are admitted to redeem, and whenever they do so, this question will be put at rest.

The tender, I was inclined to think, could not at present change the relation of the parties; its aid, in point of time, was of no consequence; it had not been repeated after the commencement of the suit, and, in my opinion, it could have no effect on that point.

There is a large mass of testimony, chiefly introduced by the

purchasers of *Watkins's* patent, under the mortgagee. Those witnesses were all interested; but they appeared to have been examined by tacit consent, and as the point to which this testimony is chiefly directed, the authority under which the sales were professed to be made, was not, in the manner I have considered the subject, necessary to be decided, it was perfectly immaterial; for if they purchased under the power contained in the mortgage, it is not pretended to have been pursued; if, as the absolute estate of the mortgagee, the reasons I have assigned for supposing it still defeasible conclude to that.

Upon the whole, I was of opinion that the complainants were entitled to a redemption in this suit; but that they must take their decree in the mode they had consented to crave it.

That the defendants should account for the moneys received and still due on the securities taken by them on the sale of the mortgaged premises; that all usual and reasonable allowances be made; that if a balance was reported against them, they should be allowed to assign such an amount of the bonds and mortgages still unsatisfied, taken for the purchase-money of the lands sold by them, to the complainants, heirs of *James Duane*, as would satisfy such balance; or, if so much did not remain due, to pay the remainder to them, retaining the amount of their costs thereout; that they should assign the mortgage to the complainants, heirs of *James Duane*, so far forth as respected the mortgaged lands which remain unsold; and that the complainants, heirs of *James Duane*, should execute to the purchasers respectively, releases of all the right they held in the mortgaged premises so sold. And that the costs of the defendants should be paid by the complainants, out of the fund arising from the sale of the mortgaged premises; and that all further directions should be reserved, &c.

*Henry*, for the appellants. To entitle a person to come into a court of equity for a redemption, he must show himself entitled to the legal estate of the mortgagor;* or, at least, he must show some interest in the equity of redemption, as having some *lien*, or as being a creditor.

The representatives of *Duane* have made out no legal estate in the premises, nor are they creditors.

Neither the original indenture of the 21st *July*, 1766, nor the deed-poll were produced, but office copies only. The condition

*Margin notes:*

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

* *Pow. on Mort.* (4th edit.) 381, 382.

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

mentioned in the deed-poll, as contained in the indenture, that the grant or deed should be void, provided any of the creditors refused to execute a release, &c. was not in the deed produced. There is no schedule annexed to the deed of *Alexander, Gregg* and *Shaw.* There are no second parties. It was not signed or executed by the trustees. It required to be interchangeably executed, and an acceptance of it was necessary. It is an inchoate, ambulatory deed, and has lain too long to entitle it to be produced in its mutilated state. A mutilated deed ought to be specially set forth, and it must be shown how it came to be mutilated. The respondents must prove their title as laid in their bill. But the deed produced shows no consent of creditors; there is no schedule as stated. It is not shown that the trust has been executed, or at all acted upon; and after such a lapse of years, the party ought to be held to strict proof.

Again, the equity of redemption was barred by the lapse of time. There was no payment, or tender of payment, either of principal or interest, on the mortgage, from its date, in 1765, to the time of filing the bill in 1799, a period of near 34 years. The pretended tender, by *Baker,* was in 1796, 31 years after the execution of the mortgage; but that tender was void, being made without competent authority.

There is not sufficient legal excuse shown by the respondents, why Mr. *Duane* did not redeem, in his lifetime, or in due season. He was bound to seek the creditor for that purpose. The allegation that he was ignorant of the place of *Grant's* residence is not admissible. And, if true, that ignorance did not exist in 1791.

The *English* rule that to create a limitation in equity, there must be a *pedis possessio* of the premises, within 20 years, does not apply here. In *England,* the possession is always in the mortgagor or mortgagee. There are no vacant lands in that country; all are occupied and cultivated. The adoption of the common law in this state, must be considered to have been made no farther than as it was applicable to the existing circumstances of this country, at the formation of the constitution. There were large tracts of wild lands wholly unsettled; and with regard to such lands, the rule is that the seisin follows or accompanies the legal estate.* Immediately on the execution of the mortgage, *Grant* must be deemed to have been in possession of the mortgaged premises, for *Shaw* had no other than a legal possession; and neither he nor *Duane,* ever took actual possession, or exercised any act of ownership,

* 8 *Johns.*
*Rep.* 269.

for above 30 years. *Grant,* on the contrary, followed up his right, by settling and improving the lands. The appellants show an actual *pedis possessio* of a part of the premises, with a claim of title to the whole.\* The whole course of the appellants' conduct shows, that they considered themselves as the absolute owners of the property, free from any equitable claim of the former owner.

The possession obtained by *Duane,* by an attornment of the tenants, after the death of *Grant,* must be deemed fraudulent; and it is a settled rule that if possession be obtained against a mortgagee by fraud, pending a suit, it must be restored, before there can be any redemption.†

By analogy, an equity of redemption is barred where an action of ejectment would be barred.‡

Again, a mortgagor cannot redeem where the mortgagee cannot compel the payment of the debt; the remedy is reciprocal.§

The trust in this case did not go to the executors of Mr. *Duane,* but to his heirs; and they did not file the bill, and were only made parties in 1806, after publication was passed, and the cause set down for a hearing.

Again, here a descent has been cast, and that is sufficient to bar the redemption. In *Chapham* v. *Bowyer,*¶ it was decided that, after a mortgage had been forfeited 20 years, and the estate descended to heirs, there could be no redemption. In *Isham* v. *Cole*\*\* a redemption of a mortgage of 33 years' standing was refused.

*Van Vechten* and *Riggs,* contra. It is a settled rule, that not only the mortgagor, but any person claiming an interest under him, may redeem;†† as an assignee of a bankrupt, an heir, a tenant, a devisee or judgment creditor.

The answer admits the heirs of *Duane* to be the surviving trustees. The legal estate is vested in the trustees. The *Bakers* and *Parker* are lessees of *Duane,* with covenants that the lessee should pay off the mortgage, and the amount be deducted from the purchase-money, in case they elected to become purchasers, before the expiration of the lease. They, therefore, had a right to redeem.

As to the objection, that the schedule was not annexed to the indenture produced, it may be said that it was not necessary that the creditors should be parties, provided the trustees accepted the

---

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

\* 1 *Caines'* *Rep.* 358.

† *Pow. on Mort.* 391.

‡ *Vin. Abr. Mort.* (T), p. 467. 2 *Eq. Ca. Ab.* 599. pl. 20.
‡ 3 *P. Wms.* 287. note.

§ 1 *Pow. on Mort.* 386.

¶ 1 *Rep. Ch.* 207. (110). See also *Saunders* v. *Hard,* ib. 184 ibid. 127.

\*\* 2 *Vent.* 340. 3 *Atk.* 225. 1 *Ch. Ca.* 102.

†† 1 *Pow. on Mort.* 343, 344, 345. 349.

1 *Chan. Ca.* 59. 1 *Vern.* 193. *Nelson,* 101. 1 *Eq. Cas. Ab.* 215. 2 *Rep. Ch.* 62. 1 *Ch. Cas.* 71. *Doug.* 22. 2 *Atk.* 44. *Bunbury,* 346. *Com. Rep.* 601. *Barnard's Ch. Rep.* 30. 32.

*IN ERROR.*

......

ALBANY,
March, 1812.

GRANT
v.
DUANE.

deed, under the condition that it was for the benefit of the creditors. It is sufficient that the mortgagor has parted with all his interest and equity of redemption. It cannot be pretended that there are no creditors. *Alexander* and *Gregg* had no interest in the premises. *Shaw* was the person who had the equity of redemption, and it is not denied that he executed the indenture. The deed-poll was produced by the appellants, not the respondents. It is enough if we show a right to redeem, as the legal representatives of a surviving trustee, named in a deed, duly executed by a person competent to convey.

Courts of equity favour the right of redemption. All that the mortgagee is entitled to is his debt, with interest. Mortgages are not within the statute of limitations; and there is no period fixed, as an absolute bar to the equity of redemption; for equity has considered that the mortgagee is not injured, if he gets his principal, interest and costs; but the mortgagor may suffer, if he is compelled to part with his estate at an undervalue.* Interest is always considered as an equivalent for the use of money. It is the compensation agreed on by the parties, for the delay of payment.† It is true, there are cases in which, on account of the difficulty of making up an account, after a long period, it will be presumed, *prima facie*, that the mortgagor has abandoned his equity of redemption; and twenty years after forfeiture and possession taken by the mortgagee, without any payment of the interest, has been fixed upon, as the time which affords that presumption. But the settlement of an account between the mortgagor and mortgagee, within 20 years, will preserve the equity of redemption; or if there is an agreement that the mortgagee shall hold the premises until he is satisfied out of the rents, time is no bar to the equity of redemption, not even 60 years, unless it appears that the mortgagee had been satisfied by the rents and profits, twenty years before, and the mortgagee had since that time continued in possession. But any acknowledgment of the mortgagee, as receiving interest, or keeping or settling an account of the mortgage, will preserve the equity of redemption.‡ So a suit on the bond, after a decree of foreclosure, at any period, opens the equity of redemption.

As it respects the equity of redemption, the mortgagor is always considered as the owner of the land.§ Where the mortgagor continues in possession, no length of time will bar the equity of redemption; and if he is in possession of any part, he may redeem the whole.¶ As to the possession of the mortgagee, in

* 1 *Pow. on Mort.* 408.

† 2 *Johns. Rep.* 614.

‡ *Pow. on Mort* 422. *Cas. in Ch.* 9. 2 *Ves.* jun. 22. *Mosely,* 189. § 1 *Atk.* 603. 2 *Vern.* 401. *Doug.* 610. 1 *Caines' Cas. in Error,* 565. ¶ *Rakestraw* v. *Brewster, Select Cases in Chan.* 55. *Cruise's Dig. Mort.* tit. 15. c. 3. s. 66, 67.

order that it should be sufficient to bar the equity of redemption, it must be an actual possession, or an actual reception of the rents and profits, such as would amount to a disseisin; and the *time* of the bar can only commence from the period of taking such actual possession. Here is no proof of any possession until 1777. *Corey* is said to have gone into possession in 1774, but there is no evidence that he acknowledged a title in the mortgagee. There was no rent paid, nor any writing, conveyance or agreement, which could fix the relation of landlord and tenant. The survey in 1791 was the first act of ownership on the part of the mortgagee. A possession of a part does not enure to the whole, where there is an adverse possession, or where the objects are entirely distinct and separate.

*IN ERROR.*
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

The letter from *Duane* to *Grant*, in 1791, shows that the former considered the equity of redemption as existing, and the latter does not deny it. If the period of the war is deducted, the period during which the mortgagee or the appellants prove themselves in possession, is not more than 18 years. If, therefore, the analogy between legal and equitable bars is to be received, there is not a sufficient lapse of time to bar in this case. Equity adopts the bar of 20 years, if justice is thereby promoted, otherwise not. It is not an absolute and controlling bar, as at law. The bar must be pleaded, or the facts amounting to a bar, alleged in the answer. Again, the bar commences from the time of forfeiture, or when the money is due.* There is nothing in the pleadings, or evidence, that shows when the money was due.

* 1 *Ch. Rep.* 206. *Nelson* 34.

The heirs of *Duane* were not parties to the bill originally filed; and it was allowed to be amended. This amendment has relation to the time of filing the original bill, and is part of the same record. The court of chancery will order a cause to stand over, in any stage of it, in order that proper parties may be added, so that an end may be put to litigation, by a final decree.† In *Hickcock v. Scribner‡* this court directed the bill to be dismissed, or amended in the court below, by adding the proper parties, and the evidence taken in the cause to stand, saving all just exceptions.

† *Hind's Ch. Prac.* 21, 22. *Mitf.* 39. 174. 259, 260. *Coop. Eq. Pl.* 332. 2 *Atk.* 15. 3 *Atk.* 570. 2 *P. Wms.* 300. 2 *Ch. Cas.* 197. ‡ 3 *Johns. Cas.* 311.

But without the amendment, they were proper parties to redeem. *Duane* was one of the heirs, and *Parker* and the *Bakers* were bargainees as to the lands lying in *Menzies'* patent.

The indenture was for the benefit of *Shaw*, who might dispense with the execution of it by a party deemed unnecessary. A stranger cannot object to the execution.§ *Shaw* mortgaged

§ 5 *Johns. Rep.* 47.

*IN ERROR.*
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

the property in 1765, and in 1766 conveyed it to trustees for the benefit of creditors.

It is not necessary that the creditors, or *cestuy que trust*, should be made parties. *Harrison*, in his *Chancery Practice*, says that the *cestuy que trust* is *ordinarily* brought in as a party; but there does not seem to be any rule on the subject. When the suit is for the distribution of the trust fund, then the *cestuy que trust* ought to be before the court; but this is not necessary when the suit is brought to collect or to get possession of the fund.*

* 21 *Vin. Ab. Mort.* 12. *Toth. Maxims,* 187.

The respondents are trustees for the representatives of *Shaw*, in the result, after the creditors are satisfied. Where the assignees of a bankrupt sue for the collection of the property, it is not necessary to make creditors parties. The appellants should either have demurred to the bill, for want of parties, or made the objection at the hearing. It is now too late to object that the creditors are not parties. And had the objection then been made, the chancellor would not have dismissed the bill, but have ordered the cause to stand over, in order that the necessary parties should be added.†

† 2 *Br. P. C.* 174. 3 *Atk.* 110, 111.

In an ejectment at law, a new demise may be added to save the statute of limitations, and to promote the ends of justice, and such amendment is considered as part of the original declaration.

The appellants, in this case, cannot object to the leasing of the land by *Duane*. A power to sell includes a power to mortgage, and, *à fortiori*, a power to lease. The answer of the appellants does not allege any attornment fraudulently obtained; it, therefore, could not, on the principle laid down in the case of *James* v. *M'Kernon*, be objected by them.

*T. A. Emmet*, in reply. The objection of want of parties may always be made, at the hearing of a cause. *Harrison*, in his *Chancery Practice*,‡ says, " A trustee may in some cases sue in his own name, but ordinarily a *cestuy que trust* must be made a party." In another place,§ he lays down the rule, that a " *cestuy que trust* must in all cases be a party; but the trustee need not, especially, if the *cestuy que trust* undertakes for him."¶ It is not stated in the bill that there were any heirs of the mortgagor; and the creditors have either been paid in money, or must be presumed to be paid, from lapse of time. *Shaw* died, and by the revolution, his *heirs* became aliens. A mere trustee, who has no legal or beneficial interest in the estate, now claims it. The land was

‡ *Hargr. Ch. Prac.* 517.
§ *Ib.* 81, 82.
¶ *Finch's Pr. in Chan.* 275. *Bunb.* 53.

mortgaged for its value, and *Shaw* was an insolvent debtor. Is it IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE. equity to take this land from the mortgagee, and give it to one who has paid nothing, nor advanced any thing to redeem it? *Duane* is, at best, but a mere trustee. And is not the mortgagee also a trustee for the mortgagor? A mortgagee in possession will hold against an *escheat.* If the property was *escheated, Duane* has no equity, for there must be parties behind the trustee to raise the equity.

Again, the respondents claim under a trust deed which is of no effect. That deed is the only title they set up to the right of redemption. The consideration of that deed was the covenant, on the part of the creditors, to release the debts. As to *Shaw,* therefore, the deed is without consideration. The mere nominal consideration of ten shillings, will not be regarded in equity. The deed is not executed by the creditors or trustees. It was an inchoate transaction. It never was completed. The *deed-poll* speaks throughout of indentures of composition. There is not a single clause recited in that deed, consistent with the deed of trust produced. Can it be presumed that *Duane,* the trustee, was so incompetent as to mistake in the recital of every covenant the deed was said to contain?

If *Duane* had no right under the deed of 1766, then the *Bakers* and *Parker* cannot be tenants. Though no fraud is charged, yet they could not *attorn* to *Duane,* without fraud. They cannot ground a right to redeem on an act which betrayed the interest of *Shaw.*

The words of the trust, in this case, were restrictive; and giving a lease, after so long a time had elapsed, was inconsistent with the trust. It was not a conditional sale, like a mortgage. *Duane* could not force the *Bakers* and *Parker* to purchase, if they refused; and it is no bargain, unless both parties are bound.

The parties to the bill, in 1799, had no interest, when the representatives of *Duane,* in 1806, were made parties, for their rights were then barred.

Where no time of forfeiture is mentioned, it is immediate ; but if the time cannot be ascertained, it must be a reasonable time, as a year, or six months, from the execution of the deed.

It is an objection to allowing a redemption, where the party seeking it has paid little or nothing for the right.* *Fleetwood v. Templeman, Ch. 187.*

In *Laughton* v. *Tracy,*† the objection was that the deed of trust † *2 Ch. Rep. 30.* was void, as there no creditor was made a party, nor any sche-

*IN ERROR.*

......

ALBANY,
March, 1812.

GRANT
v.
DUANE.

dule of debts annexed; but this was considered as only evidence of fraud, and did not render the deed void, it appearing to have been executed *bona fide.*

The mutilated deed produced in this case, with the schedule of creditors torn off, is evidence that it has been abandoned or cancelled. If so, the respondents can derive no title from it to redeem.

Again, *Grant* took this mortgage from an insolvent debtor, as the only practicable security. It was a mortgage of wild land, of little value, at the time; and he could only look to the increase of its value, by lapse of time, and by improvement, for the reimbursement of his principal and interest. *Grant,* as mortgagee, had the legal possession, and had a right also to take actual possession of the premises. It is, therefore, under these circumstances, a fair and equitable presumption, that he did so perfect his title, *bona fide,* in satisfaction. The mortgagor, an insolvent debtor, died; what other remedy was there but the land? The trustees made no attempt to appropriate these lands, for 30 years, after the death of *Shaw.* Is it not, then, a fair presumption, that they left *Grant* to take the land, for his debt, as there were no other funds out of which he could be paid?

The land was called *Grant's* land. It may have been morally wrong in him to have represented it as absolutely his own, but this shows that he claimed title to the land.

The law of mortgages in *England,* has grown up, since all the lands in that country have been in actual occupation and under cultivation. Possession there commences from the forfeiture.*

In this country, an actual *pedis possessio* of the whole ought not to be required, on principles of policy and justice. A mortgagee having the legal possession, when there is no adverse possession against him, when no interest or principal is paid, ought to be deemed as in the actual possession. A contrary doctrine would lead to this, that no lapse of time could bar an equity of redemption in wild lands; but the mortgagee must occupy and cultivate them, if he means to acquire such a possession as may bar the right of the mortgagor to redeem. *Comstock* settled on the land, under *Grant's* right, and a possession of a part is sufficient in ejectment.†

[SPENCER, J. The principle was settled, in this court, in a case respecting *Livingston's Manor,* that an actual possession of

* 2 *Cruise's Dig.* 152. 1 *Fonb. Eq.* 332. b. 1. c. 4. s. 27. note 3. *Wils.* 34. 1 *Rep. in Chan.* 127.

† 1 *Caines' Rep.* 358.

tenants in different parts would draw to it the possession of the wild and unsettled part of the same patent.](a)

In *Hales* v. *Hales*,* a sleeping mortgage of 40 years was presumed to be paid. Where there is no other remedy for the debt but the land, there can be no redemption.

The acknowledgment by a mortgagee to save the right of redemption, must be deliberate and explicit. A casual conversation between two persons is not sufficient.

Eight witnesses testify that the appellants sold the land as their own, though the title was at first by mortgage. The executors sold by virtue of the power in the will of *Grant.* Whether they had a legal power or not, is immaterial. It shows that they did not sell under the mortgage.

The letter of *Duane,* unanswered and unnoticed, is evidence of nothing. The fraud as to the attornment to him, was matter of law, arising from the facts set forth in the pleadings; it was not necessary to put it in issue.

The heirs of *Duane* did not come in until 1806, and they ought not, by a notion of reference back to the commencement of the suit, to stand on better ground than they otherwise would have done. *James C. Duane* took no step, as heir, until 1806. Suppose after the heirs were admitted as complainants, the executors of *Duane* had been struck out as useless parties, could they be considered as having filed their bill in 1799 ?

THOMPSON, J. Whoever comes into a court of justice to seek redress, must show in himself some interest in the subject matter of the claim set up, or it must appear that his name is used *pro forma,* for the benefit of the party really in interest. In the present case, the bill filed in the court of chancery, had for its object the redemption of a mortgage given by *David Shaw* to *James Grant,* bearing date the 25th of *November,* 1765. If the respondents have shown no interest in themselves, or a right to redeem the mortgage, on their own account, or on account of others, with whom some connexion is shown, and whose interest they have a right to represent, their claim cannot be supported, notwithstanding some other person might have a right to enforce the

IN ERROR.
......
ALBANY,
March, 1812.
GRANT
v.
DUANE.
* 1 *Ch. Rep.*
105.

---

(a) See *Jackson, ex dem. Livingston,* v. *Schutt,* cited by *Kent,* Ch. J. in *Jackson* v. *Lunn.* (3 *Johns. Cas.* 113.)

*IN ERROR.*
.....
ALBANY,
March, 1812.

GRANT
v.
DUANE.

same claim. It cannot be allowed to them to speculate on the claims of others, and redeem at their peril, and then litigate with those who may have the right.

No person can come into a court of equity for a redemption of a mortgage, but he who is entitled to the legal estate of the mortgagor, or claims a subsisting interest under him. (1 *Pow. on Mort.* 343. 381, 382. 1 *Vern.* 182.) The respondents claim the right to redeem, in consequence of a deed given by *David Shaw*, (the mortgagor,) together with *John Alexander* and *John Gregg*, to *James Duane*, and two others, of whom *Duane* was the survivor, bearing date the 21st of *July*, 1766. This deed is the title on which they rest; and that title is denied by the appellants, in their answer in the court of chancery. And it is competent for them here, to contest its legal effect and operation, or show that it is null and void.

The objection to the respondents' right to redeem, does not strictly fall within that class which relates to a defect of parties, but strikes at the merits of their claim, by totally denying any interest whatever in them. But if the objection be considered as resting on the want of parties, it having been made in the court below, it may be insisted on here. This is a deed in trust, for the benefit of creditors, and it will be perceived from the date of it, that the claim now set up is a very stale one, so that all reasonable presumptions may and ought to be indulged against it. After the lapse of thirty or forty years, such a claim ought to be viewed with a jealous eye, unless accompanied with a satisfactory excuse for the delay to assert it. The deed given to the trustees was for the purpose *only* of paying the debts of the grantors, and it is no more than reasonable to presume, that that purpose has been accomplished. These debts must have been long since barred by the statute of limitations, and the legal presumption of payment. The *trust* has, therefore, been *executed.* It ought to be observed, that the mortgaged premises were the sole and exclusive property of *Shaw*, and not the property of the grantors jointly. Nor is there in the deed of trust, any specification of those lands, although there is of other real property. They are comprised in the general descriptive clause in the deed. And the presumption is strong and almost irresistible, that the object of the trust was answered out of other property included in the trust deed; especially, as it did not extend to the payment of debts secured by mortgage. And the trustees probably chose rather to resort to property unencumbered, than to discharge the encumbrance on this land, which was, most likely, at

that day, nearly its full value. It was not the intention of the grantors, by this deed of trust, that the trustees should take more property than enough to satisfy the debt. And such is the legal effect and operation of the deed. For it expressly provides, that if the debts could be satisfied by sale of a *part* only of the premises thereby granted, the trustees should reconvey the residue. A claim of a right to execute this trust, without showing that there are yet debts unpaid, is against the spirit and intention of this covenant. If all the debts were paid, the trustees were bound to reconvey ; and equity, in such cases, will presume that done which ought to have been done. It appears to me, therefore, that the respondents have failed to show a subsisting interest, under the mortgagor, by not showing the existence of any debts yet to be satisfied out of the trust estate. If the trust has been executed without having recourse to the lands in question, they fall under the residuary part, which, as it appears from the deed itself, cannot belong to the trustees or their heirs. And the lapse of time is, of itself, amply sufficient to warrant the presumption of an execution of the trust.

I have thus far considered the respondents' claim, on the supposition that the deed in trust, now set up, was the deed under which the composition and settlement of the debts of *Alexander, Gregg* and *Shaw*, were made. There is, however, strong ground for the presumption, that the arrangement contemplated between the parties, of which the deed only forms a part, was either never consummated, or was abandoned or superseded by another arrangement. The deed itself is not produced. Although it purports to contain covenants on the part of the trustees and creditors, it does not appear to have been executed by either of them. Reference is made to a schedule, purporting to be annexed to the deed, and to form a part of it, but which does not now accompany it. All this tends very strongly to show that the signing of this deed by *Alexander, Gregg* and *Shaw*, (which was on their part imperfect, as *Shaw* could not execute it for *Alexander*,) was only an inchoate transaction, and never consummated. This presumption is rendered almost certain, by the recitals in the deed of *Alexander* and *Gregg*, of *December*, 1767. No objection can be made to these recitals, by reason of this being a deed-poll. It is a deed to *Duane*, and the other trustees, and for their benefit. And the inference is irresistible, that it was *accepted* by them, and if so, they are bound by the recitals. The express object of this deed appears to have been, to release and discharge the trustees

IN ERROR.
......
ALBANY,
March, 1812.

GRANT
v.
DUANE.

from some of the covenants contained in a deed of composition before *executed* by *Alexander*, *Gregg* and *Shaw*, of the first part, their creditors, whose names were specified in a schedule thereto annexed, of the second part, and the trustees of the third part. It expressly recites that the greater part of the creditors had duly become parties to, and executed the deed of composition. The deed produced is not so executed. The covenants recited are very different from those contained in the deed produced, notwithstanding the recitals purport to be *in hæc verba*. By the recital, the deed of composition was to be *void* and of no effect, if any of the creditors should refuse to release and discharge their debts. And on such refusal the trustees covenanted to reconvey. In the deed before us, no such condition, or covenant is to be found. The recited deed purports to contain a covenant, on the part of the trustees, to pay *Gregg* 2,500*l.* if the creditors should refuse to release their debts; no such provision is contained in the deed produced. Other variances might be pointed out, but enough has been shown to justify the conclusion, that the deed referred to by these recitals is not the one produced, and on which the respondents rest their title; and if this deed be put out of view, there is nothing to show that the mortgaged premises were ever conveyed to the trustees. For admitting there was another deed of composition to which the recitals refer, there is no evidence that it included the lands in question.

This view of the case renders it unnecessary for me to examine whether the equity of redemption is not barred by the lapse of time, and the possession held by the mortgagee and his representatives. The case presented is certainly a very strong one on this point. It will be time enough, however, to decide it, when the heirs of *Shaw*, who alone, from any thing that appears, are entitled to redeem, shall think fit to ask a redemption. At present, it is only necessary to decide on the rights of the respondents, and, as I am satisfied they do not show themselves entitled to redeem, I think the decree of the court of chancery ought to be reversed.

March 10th,
1812.

This being the unanimous opinion of the court; it was thereupon, ORDERED, ADJUDGED and DECREED, that the decree of the court of chancery be reversed, that the respondents' bill be dismissed; that the respondents pay to the appellants their costs in the court of chancery, to be taxed, and that the record be remitted, &c. Judgment of reversal.